**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL A. GINGRICH and | ) | |
| JANN C. GINGRICH, | ) | |
| | ) | CIVIL ACTION |
| Plaintiffs, | ) | |
| | ) | File No. 16-cv-11382 |
| BANK OF AMERICA, N.A. and | ) | |
| NEW PENN FINANCIAL, LLC, d/b/a | ) | |
| SHELLPOINT MORTGAGE SERVICING, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs MICHAEL A. GINGRICH and JANN C. GINGRICH, by the undersigned attorneys, bring this complaint against Defendants BANK OF AMERICA, N.A. and NEW PENN FINANCIAL, LLC d/b/a SHELLPOINT MORTGAGE SERVICING, as follows:

### NATURE OF THE ACTION

1. Plaintiffs Michael A. Gingrich and Jann C. Gingrich bring this action for damages for breach of contract and for violations of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), the Real Estate Settlement Procedures Act ("RESPA"), and the Fair Debt Collection Practices Act ("FDCPA").

2. All of the claims stated herein stem from Defendants' wrongful servicing and debt collection activities related to Gingrich's home mortgage loan.

### JURISDICTION AND VENUE

3. Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1337, 12 U.S.C. § 2614 (RESPA), and 15 U.S.C. § 1692k (FDCPA), as the action arises under the laws of the United States. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

1

4.  Diversity jurisdiction is conferred upon this Court by 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000.00 and is between citizens of different states.

5.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 as the subject property is in this District and the events occurred in this District.

PARTIES

6.  Plaintiffs Michael A. Gingrich and Jann C. Gingrich (collectively "Gingrich") are natural persons who reside at 440 Parkside Drive, Sycamore, Illinois 60178 ("subject property"). Gingrich purchased the subject property in 1997 as a primary family residence.

7.  Defendant Bank of America, N.A. ("BANA") is a Delaware corporation with its principal place of business located at 100 N. Tryon Street, Charlotte, North Carolina 28255. BANA is a nationally chartered banking association that offers consumers a full range of banking, servicing, and mortgage products, including home loan modification programs through the Home Affordable Modification Program, across the country including in the state of Illinois.

8.  Defendant New Penn Financial, LLC is a Delaware limited liability company with its principal place of business at 4000 Chemical Road, Suite 200, Plymouth Meeting, Pennsylvania 19462. New Penn Financial, LLC is a wholly-owned subsidiary of Shellpoint Partners LLC.

9.  New Penn Financial, LLC does business in Illinois under its assumed name Shellpoint Mortgage Servicing (hereinafter "Shellpoint"). Its registered agent is Illinois Corporation Service Company located at 801 Adlai Stevenson Drive, Springfield, IL 62703. Shellpoint acts as a debt collector and servicer of mortgage loans across the country, including in the state of Illinois.

## FACTS SUPPORTING CAUSES OF ACTION

10. On December 3, 1997, Gingrich executed a Freddie Mac mortgage loan with Covenant Mortgage Corporation in the amount of $68,400.00 for the purchase of the subject property as a primary residence. This mortgage loan included a fixed interest rate of 8.0%.

11. On December 3, 1997, the mortgage loan with Covenant Mortgage Corporation was immediately assigned to Old Kent Mortgage Company.

12. On or about May 19, 1998, the loan was assigned to NationsBanc Mortgage Corporation. NationsBanc later merged with BANA, and BANA became the loan servicer.

13. Due to a financial setback beginning with Mr. Gingrich's employment layoff, Gingrich defaulted on the subject loan in 2013.

14. On July 3, 2013, BANA sent Gingrich a letter stating that Gingrich had missed his last three regularly scheduled payments. To avoid foreclosure, BANA offered Gingrich a loan modification through the Home Affordable Modification Program ("HAMP"). A HAMP modification required Gingrich to complete a "Borrower Response Package."

15. On August 4, 2013, by facsimile transmission, Gingrich returned the completed Borrower Response Package with the requested financial information to Kevin Fulton, a customer relationship manager with BANA's Home Loan Team.

16. On August 7, 2013, BANA acknowledged receipt of the Borrower Response Package and advised Gingrich that it would take approximately five days to review.

17. Also on August 7, 2013, BANA sent a letter advising Gingrich that BANA could not complete its loan modification review "because some information we need is missing or incomplete." Specifically, BANA requested the following as "missing" information:

- Tax Return (Gingrich previously explained that flooding had ruined belongings in their house, including copies of tax returns and in lieu of producing the returns, Gingrich provided BANA with a signed 4506-T form);
- Verification of Occupancy;
- Homeowners Association Documentation;
- Property Tax Statement;
- Homeowners Hazard Insurance;
- Proof of Hardship;
- Non-Borrower Income Contribution;
- Form 710 Uniform Borrower Assistance Form; and
- Hardship Letter.

18. Gingrich had previously submitted this documentation to BANA on August 4, 2013.

19. On August 20, 2013, Gingrich contacted Dawneisha Taylor (Gingrich's assigned relationship manager) via telephone. At Ms. Taylor's direction, Gingrich faxed the documentation to Ms. Taylor and requested confirmation of receipt.

20. On August 21, 2013, after Ms. Taylor failed to confirm receipt, Gingrich placed two phone calls to Ms. Taylor, leaving a voicemail each time and requesting a return call.

21. On August 22, 2013, Gingrich placed another call to Ms. Taylor and left a message on her voicemail. Gingrich then placed a call to Ms. Taylor's supervisor, Gamaliel Ortiz, leaving a voicemail and requesting a return call.

22. On August 22, 2013, Gingrich placed another call to BANA, insisting that he speak with Mr. Ortiz. Suddenly, Ms. Taylor came on the line and indicated that the documents had been received and were being reviewed by the underwriter.

23. On September 3, 2013, Gingrich placed two calls to BANA, each time leaving voicemails for Ms. Taylor and Mr. Ortiz. Neither returned Gingrich's phone calls.

24. On September 6, 2013, Gingrich placed another call to BANA and spoke with Brittany Bellingham who indicated that underwriting still needed Gingrich's tax returns. Gingrich advised that his previous August 20, 2013 letter explained why the tax returns could not be provided directly and why Gingrich sent BANA a signed IRS Form 4506-T. Ms. Bellingham told Gingrich that Gingrich's cover letter with this information was never read by BANA.

25. On September 6, 2013, Gingrich then sent two letters to BANA: (1) a letter resubmitting his August 20, 2013 letter to BANA; and (2) a letter detailing the previous phone calls and requesting that Kevin Fulton be reassigned as customer relationship manager.

### A. <u>HAMP Trial Payment Plan</u>

26. On September 21, 2013, BANA notified Gingrich that they were approved to enter into a Trial Period Plan ("TPP") under HAMP.

27. As an incentive to accept the modification, if all payments were timely made, Gingrich could accrue up to $1,000 per year for five years, to be applied to the principal balance on the anniversary of the first TPP payment.

28. To accept the offer, Gingrich had to (a) sign and return the "Intent to Accept Trial Offer;" (2) contact BANA at 1.800.669.6650; and (3) make three trial payments in the amount of $727.20 by November 1, 2013, December 1, 2013, and January 1, 2014.

29. Gingrich completed all of the steps required under the TPP and made all three of the required payments to BANA

30. Between October 2013 and December 2013, Gingrich made numerous phone calls to BANA to confirm receipt of his TPP payments and confirm the next steps. BANA accepted all of Gingrich's payments, but would not provide Gingrich any information.

31. On October 28, 2013, Gingrich faxed BANA a letter requesting specific information regarding the loan modification. BANA did not respond.

**B.  The First Loan Modification**

32. On January 7, 2014, BANA notified Gingrich in writing that they were approved for a permanent HAMP loan modification. *See* **Exhibit A**, attached hereto. The HAMP loan modification agreement ("First Modification") had the following terms:

   a. New loan balance of $53,035.37;

   b. Interest rate of 2.0% for the first 5 years; 3.0% for year 6; 4.0% for year 7; and 4.5% for years 8 through 15;

   c. Monthly payments of $727.57 beginning February 1, 2014, made up of $347.94 for principal and interest and $379.63 for escrow;

   d. Escrow shortage of $1,115.27 included in the monthly escrow payment; and

   e. Borrower incentive if monthly mortgage payments were timely made.

33. The new loan balance included past due interest of $1,519.32 and servicing expenses paid of $15.00 to third parties, for a total of $1,534.32 added to the principal balance.

34. The First Modification included the following errors:

   a. Mr. Gingrich's name was misspelled ("Mic*ah*el" instead of "Mic*ha*el"); and

   b. The date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): ***January 1, 1998*** (correct date was December 3, 1997).

35. To accept the offer, the First Modification had to be signed, notarized, and returned to BANA. *Id.*

36. The signature block and instructions on the First Modification specifically stated, "make sure that your printed name is correct" and instructed that the "signatures must be signed

exactly as printed." Michael Gingrich's name was erroneously printed "Mic*ah*el" in the signature block and in the notary acknowledgement. *Id*.

37. Upon receipt of the First Modification, Mr. Gingrich attempted to sign and notarize, but the notary public would not notarize his signature because his name was misspelled.

38. Throughout January, February, and March 2014, Gingrich made numerous phone calls to BANA to attempt to have his name corrected on the document, but BANA refused to make the correction.

39. During this same time period, Gingrich regularly received phone calls from BANA, where BANA would request the signed First Modification from Gingrich.

40. These calls from BANA were made as if BANA had no knowledge of the errors in the First Modification (particularly the misspelled name). Gingrich would again explain the errors to BABA and request corrected documents.

41. BANA refused to clearly or honestly communicate with Gingrich or make efforts to correct the misspelled name in the First Modification.

42. On or about January 16, 2014, BANA mailed a follow-up letter to Gingrich stating that BANA had not received the signed First Modification.

43. On or about January 28, 2014, BANA mailed another letter to Gingrich stating that (1) BANA had not received the signed First Modification, (2) BANA was unable to proceed unless the documents were received, and (3) BANA was sending a representative from J.M. Adjustment Services, LLC to meet with Gingrich at their home to provide assistance.

44. BANA never sent a representative to meet with Gingrich to provide any assistance.

45. Even though BANA did not fix the error, Gingrich made the first payment of $727.57 due for February 1, 2014 under the First Modification to BANA. BANA accepted the payment.

7

46. Gingrich made the second payment of $727.57 due for March 1, 2014. BANA accepted the payment.

47. On or about March 15, 2014, BANA notified Gingrich that they were no longer being considered for a modification because they did not sign and return the First Modification.

48. On April 2, 2014, BANA re-sent the First Modification package to Gingrich. Michael's name was still misspelled and the documents stated they must be signed and returned by January 22, 2014.

49. On April 4, 2014, Mr. Gingrich called BANA and faxed a letter clearly stating the correct spelling of his name.

50. Gingrich continued to tender a $727.57 payment to BANA each and every month in 2014 as required under the First Modification. BANA accepted all 11 payments due February 2014 through December 2014 (plus the TPP payment in January 2014).

51. Throughout the entire process of applying for a loan modification, Gingrich was led to believe the process was being handled directly by BANA.

52. The application and modification were actually reviewed, processed, and prepared by Urban Settlement Services, LLC ("Urban"), BANA's attorney-in-fact. The return address on the First Modification was 11802 Ridge Parkway, Ste 100 HRM, HOME RETENTION, Broomfield, CO 80021. This is Urban's address.[1] *See* **Exhibit A**.

53. BANA did not review Gingrich's loan modification applications. Rather, BANA contracted with Urban to review and process loan modifications, including Gingrich's loan modification. No effort was made to correct the spelling of Mr. Gingrich's name in order to timely finalize the loan modification.

---

[1] After recording, the Agreement was to be returned to Bank of America, N.A., at Urban's address in Broomfield, CO. *All* BANA loan modification documents overnighted to Gingrich originated from Urban's Colorado address and used Urban's address as the return address.

### C. **The Second Loan Modification**

54. By letter dated April 3, 2014 (and overnighted to Gingrich on April 4, 2014), BANA notified Gingrich that they were again approved for a permanent loan modification.

55. This modification had an effective date of "02/01/2014" ("Second Modification") and included the same principal balance, interest rate, and monthly payments as the First Modification. *See* **Exhibit B**, attached hereto. However, the Second Modification included an additional "Deferred Amount" of $1,455.14 due at the end of the mortgage term. *Id*.

56. The Second Modification again erroneously listed the date of the first lien mortgage and note as January 1, 1998, but Michael Gingrich's name was spelled correctly. *Id*.

57. The signature page identified Urban as BANA's attorney-in-fact, and the document, upon recording, was to be returned to Urban's address. *Id*.

58. There was no notary requirement or acknowledgment on the Second Modification. *Id*.

59. On April 14, 2014, BANA called and directed Gingrich to return the Second Modification within 48 hours (the enclosure cover to the Second Modification stated the modification must be signed and returned by April 18, 2014). *Id*.

60. Also on April 14, 2014, BANA sent Gingrich a letter stating that BANA had not received the signed Second Modification.

61. Jann C. Gingrich signed and dated the Second Modification on April 14, 2014.

62. Michael A. Gingrich signed and dated the Second Modification on April 16, 2014.

63. On April 16, 2014, Gingrich returned the fully signed Second Modification to BANA. *See* **Exhibit C**, attached hereto.

64. On May 14, 2014, BANA re-sent Gingrich an uncompleted packet for the Second Modification as if a previous loan modification offer was never made.

65. On May 26, 2014, Gingrich sent a letter to BANA setting out the problems with the loan modification process over the past several months, including the additional $1,455.14 in charges added to the Second Modification.

66. On June 6, 2014, BANA re-sent Gingrich the *January 7, 2014* letter and *First Modification* to Gingrich with Michael's name misspelled. The documents were to be returned to Urban's address.

67. Gingrich continued to tender, and BANA continued to accept, Gingrich's $727.57 payments each month.

68. On September 3, 2014, BANA notified Gingrich that BANA was no longer considering Gingrich's request for a modification, "because after being offered a Home Affordable Modification, you did not return the permanent modification documents by the requested deadline."

69. On November 17, 2014, BANA sent a letter to Gingrich stating that based on a "careful review" of their loan, BANA was offering Gingrich an opportunity to enter into a new loan modification altogether, beginning with a new TPP. *See* **Exhibit D**, attached hereto.

70. Upon successful completion of the a new TPP, Gingrich would receive a loan modification with a fixed interest rate of 8.0% (as opposed to 2%) and higher monthly payments than the previous modifications. *Id*.

71. On November 23, 2014, Gingrich sent a letter to BANA's Executive Customer Service, detailing the past year's problems surrounding their loan modification application and how his previous letters and phone calls to BANA went unaddressed.

72. Shortly thereafter, a BANA customer service representative told Gingrich that all previous payments made by Gingrich would be applied to the account under the Second Modification and that the $1,455.14 added to the Second Modification would be zeroed-out.

73. In reliance upon these statements, Gingrich signed and returned the Second Modification to BANA on November 25, 2014. *See* **Exhibit E**, attached hereto.

74. On November 28, 2014, BANA acknowledged receipt of Gingrich's letter and signed Second Modification, and stated it would take approximately five days to review.

75. On December 3, 2014, BANA sent a letter (originating from Urban's Colorado address) to Gingrich stating that BANA received the "Borrower Response Package" (not the signed Second Modification), but could not complete its review because financial information was missing. The letter itemized four pages of "missing" information.

76. This letter confirmed that BANA was, once again, not honoring the Second Modification**.** At this point, Gingrich lost all faith in BANA. Gingrich did not submit additional loan modification documents after the November 25, 2014 submission.

77. However, on or about February 3, 2015, BANA sent a "thank you" letter to Gingrich for submitting new documents, and stated that BANA was reviewing the modification package.

78. On April 23, 2015, BANA sent another letter (generated by Urban) to Gingrich offering yet another TPP for a loan modification with a fixed interest rate of 8.0% (as opposed to 2%) and higher monthly payments than the First and Second Modifications.

79. Notwithstanding the foregoing, Gingrich continued to tender, and BANA continued to accept, a $727.57 payment from Gingrich each month from February 2014 through June 2015 (and the three TPP payments for November 2013, December 2013, and January 2014).

### D. **Servicing Transfer to Shellpoint**

80. On June 25, 2015, BANA notified Gingrich that BANA was transferring servicing rights to Defendant Shellpoint effective July 16, 2015.

81. Seeing no resolution regarding the loan modification, Gingrich contacted BANA to insist upon an immediate resolution prior to the transfer.

82. BANA directed Gingrich to speak with BANA's "Post-Transfer Group." Gingrich then explained to the Post-Transfer Group what happened over the previous 18 months.

83. BANA assured Gingrich that no additional action was required, and that BANA would notify Shellpoint of Gingrich's loan modification and provide Shellpoint the documentation. BANA stated that it would conduct an investigation and provide Gingrich with an update in a couple weeks.

84. BANA never responded nor provided the results of the investigation.

85. On July 28, 2015, Gingrich received a phone call from Shellpoint (Lvana Lara), who informed Gingrich of the servicing transfer to Shellpoint. When Ms. Lara attempted to "verify" the account information, Gingrich realized the previous loan modification was not implemented.

86. Shortly thereafter, Gingrich received a registered letter from Shellpoint stating "your new Penn VPC Bank of America 179764 mortgage, serviced by Shellpoint Mortgage Servicing is now 60 or more days overdue and your loan may be referred to foreclosure."

87. On September 30, 2015, Gingrich faxed and mailed a RESPA Notice or Error and Request for Information ("NOE/RFI") to Shellpoint that stated, *inter alia*, that (1) the account was not past due, (2) the loan was previously modified under HAMP while serviced by BANA, and (3) Gingrich was requesting that Shellpoint correct the errors with the account.

88. Shellpoint did not acknowledge receipt or respond to the September 30, 2015 NOE/RFI.

89. On October 6, 2015, Gingrich mailed a NOE/RFI to BANA, stating that BANA provided Shellpoint with incorrect information regarding the account and loan modification. Gingrich requested copies of all documents, including account notations and records from BANA's Document Management System, internal notes, and notes from phone conversations on Gingrich's account covering 2013 through 2015.

90. On October 18, 2015, BANA responded to Gingrich's QWR with some documentation for the period of January 1, 2014 to October 15, 2015, most of which was heavily redacted. BANA did not conduct an investigation or correct the account.

91. On October 19, 2015, Gingrich sent a request to BANA to resolve their mortgage modification documentation problem and process the modification documents as promised.

92. Shellpoint continued to send Gingrich statements and default notices, claiming that Gingrich was in substantial default as if no loan modification existed.

93. However, Gingrich continued to tender payments of $727.57 to Shellpoint. Shellpoint accepted five monthly payments through December 2015.

94. On or about January 4, 2016, Shellpoint mailed Gingrich a Notice of Default and Intent to Accelerate, stating $9,870.98 was due to bring the account current, and if that amount was not paid within 30 days, Shellpoint could proceed with foreclosure of Gingrich's home.

95. On February 11, 2016, Gingrich mailed a second NOE/RFI to Shellpoint. Gingrich stated that they were not behind on payments; their mortgage was modified under the HAMP program; and the modification payments had been made and accepted.

96. On February 17, 2016, Shellpoint responded to Gingrich's second QWR and stated that they were working to gather the requested information.

97. On February 26, 2016, Gingrich sent a second NOE/RFI to BANA. Gingrich requested that BANA (1) remove the $1,455.14 included in the Second Modification; (2) finalize and record the permanent modification; (3) coordinate with Shellpoint to update the account as current and without late fees or charges; and (4) remove any negative credit reporting.

98. On February 29, BANA acknowledged receipt of Gingrich's second NOE/RFI. BANA issued a second acknowledgment on March 3, 2016; a third on March 7, 2016; and a fourth on March 15, 2016.

99. On March 28, 2016, BANA responded to Gingrich's second NOE/RFI, stating:

> [BANA] records indicate that all information regarding [Gingrich's] loan modification agreement was transferred successfully to the new servicer of [Gingrich's] loan, Shellpoint Mortgage Servicing ["Shellpoint"] when the loan was transferred for servicing effective July 16, 2015. [BANA] contacted Shellpoint and were advised that as of Friday, March 25, 2016, Shellpoint is working to implement the terms of [Gingrich's] Loan Modification Agreement to [Gingrich's] account. Upon successful completion of this process, Shellpoint will submit [Gingrich's] documents for recording.

100. On April 12, 2016, Gingrich sent a third NOE/RFI to BANA requesting explanation of BANA's March 28, 2016 response and demanding further documentation.

101. On April 13, 2016, Shellpoint responded to Gingrich's second NOE/RFI, stating:

    i. FHLMC is the current owner of the account;

    ii. Shellpoint began servicing the loan on July 15, 2015;

    iii. the unpaid principal balance is $48,833.37;

    iv. Shellpoint acknowledged receipt of a modification approved by BANA, but that at the time of the transfer to Shellpoint, the approved modification was not completed by BANA; and

    v. Shellpoint was seeking approval from the investor of the loan to apply the modified terms.

14

102. On May 4, 2016, BANA responded to Gingrich's third NOE/RFI stating that no corrections to Gingrich's account were warranted. BANA acknowledged receipt of the signed Second Modification, but stated that the agreement was invalid because it "could not be processed *as both signatures must be signed on the same day*." BANA stated that no valid HAMP modification existed upon the transfer to Shellpoint. *See* **Exhibit F**, attached hereto.

103. This was false and conflicted with BANA's March 28, 2016 correspondence.

104. Neither BANA nor Shellpoint ever investigated Gingrich's account, corrected the account, or honored the loan modification after receipt of any of Gingrich's NOEs/RFIs.

105. Shellpoint has continued to accept $727.57 payments from Gingrich through 2016.

106. Throughout 2016, Shellpoint sent Gingrich numerous notices of acceleration and threats of foreclosure.

107. Under duress and in fear of losing the family home, Gingrich has paid BANA and Shellpoint – and BANA and Shellpoint have accepted – approximately $26,200.00 in payments under the loan modification.

108. All of BANA's and Shellpoint's actions are the proximate cause of damages to Gingrich that include: (a) improper fees, charges, and interest, (b) an increased interest rate, (c) increased monthly payments, (d) the loss of funds that BANA and Shellpoint stole, (e) damage to credit and reputation, (f) the loss of equity in their home, (g) the loss of other loss mitigation opportunities, and (h) increased stress, anxiety, emotional distress, loss of sleep, and pain and suffering, including physical manifestations of the stress.

109. BANA and Shellpoint have unduly profited from Gingrich's payments and failed to honor Gingrich's binding loan modification.

## COUNT I – BREACH OF CONTRACT
## (AGAINST BANA AND SHELLPOINT)

110.  Gingrich restates and realleges all prior paragraphs as though fully set forth herein.

111.  Gingrich has an enforceable loan modification contract with BANA and Shellpoint as the assignee of BANA (hereinafter BANA and Shellpoint collectively "Defendants").

112.  Gingrich fully performed all duties under the First and Second Modifications by tendering monthly payments and complying with all other terms of the agreements.

113.  Defendants were required to honor the terms of the agreements and properly credit payments received from Gingrich. Defendants misapplied Gingrich's payments and failed to properly allocate payments to principal, interest, and escrow as required by the contract.

114.  Defendants recorded Gingrich's loan as past due, refused to implement the loan modification, and continued to treat the loan as in "default" for the last three years

115.  Gingrich requested Defendants to honor the terms of the cntracts, but the requests were refused. Defendants are in further material breach of the modification contracts for their:

      a.  assessment of unauthorized late fees, legal fees, and costs;

      b.  failure to apply payments to interest and principal before escrow and fees;

      c.  failure to provide accurate statements and correspondence;

      d.  failure to accurately respond to Gingrich's calls, letters and other disputes; and

      e.  failure to conduct their affairs in good faith.

116.  Gingrich suffered damages proximately caused by Defendants' conduct of as set forth in paragraphs 107 and 109 above.

WHEREFORE, Gingrich requests that this Honorable Court:

      a.  enter judgment in their favor and against BANA and Shellpoint;

      b.  find that BANA and Shellpoint materially breached the contract;

      c.  award Gingrich their actual damages to be proven at trial; and

      d.  award Gingrich any other relief this Court deems equitable and just.

## COUNT II – VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
### (AGAINST BANA AND SHELLPOINT)

117.  Gingrich restates and realleges all prior paragraphs as though fully set forth herein.

118.  Gingrich is a "consumer" and "person" under ICFA. *See* 810 ILCS 505/1.

119.  Defendants violated 815 ILCS 505/2 by engaging in unfair and deceptive acts in the course of conduct involving trade or commerce when dealing with Gingrich.

### A.  Violations of HAMP

120.  The subject loan is eligible under HAMP.

121.  As participants in HAMP, Defendants are required to comply with HAMP directives and guidelines.

122.  It was unfair and deceptive for Defendants to violate HAMP guidelines and directives by denying Gingrich a permanent loan modification after Gingrich successfully completed a TPP and made three years' worth of loan modification payments. Additionally, Defendants violated the express provisions of HAMP by:

      a.  failing to review and process the loan modification;

      b.  contracting with a third party, Urban Settlement Solutions, for the handling of Gingrich's loan modification application;

      c.  failing to treat Gingrich's case as an "Escalated Case" after Gingrich made repeated objections;

      d.  failing to established "Right Party Contact" with Gingrich;

      e.  failing to connect Gingrich with a "Relationship Manager" who responded to Gingrich's telephone calls, or a party possessing the necessary training and authority to achieve a resolution and resolve complaints from Gingrich;

      f.  failing to act on Gingrich's appeal within the 30-day appeal period;

      g.  failing to provide Gingrich with the timely, accurate, and consistent information regarding the loan modification and their true eligibility for a loan modification under HAMP;

      h.  regularly demanding that Gingrich resubmit and resign the same documents that had previously been submitted and signed on numerous occasions; and

      i.  sending the same modification numerous times.

123. Defendants violated HAMP by adding interest and fees and pursuing foreclosure in an effort to profit from their wrongful "denial" of the permanent loan modification.

124. As participants in HAMP (and as servicers of an FHLMC loan), Defendants received compensation from Freddie Mac each time Gingrich "completed" a loan modification. If Gingrich signed a loan modification, BANA was compensated by Freddie Mac.

125. Defendants took the compensation from Freddie Mac under HAMP, without providing Gingrich with a permanent modification in violation of HAMP guidelines.

126. It was unfair and deceptive for Defendants to disregard FHLMC and HAMP guidelines and directives for the evaluation, formation, and servicing of Gingrich's modification.

### B. Additional Unfair and Deceptive Acts

127. Defendants made outright unfair and deceptive misrepresentations to Gingrich as to the status of the loan account, the amounts owed, the status of the loan modifications, how payments were and would be applied, how Gingrich *should* act, and Defendants' actual treatment of Gingrich's account internally compared to their representations.

128. It was unfair and deceptive for BANA to:

  i. repeatedly ignore Gingrich's notifications to correct the spelling of "Michael" and continue to send Gingrich loan modification agreements with Michael's name misspelled, instead of correcting the documents after repeated notice;

  ii. re-send Gingrich the First Modification with the misspellings *after* Gingrich signed and returned the Second Modification with the proper spelling;

  iii. falsely claim that the First Modification was invalid because Gingrich failed to return the signed agreement (with the name misspelled);

  iv. falsely claim that the Second Modification was invalid because Michael Gingrich and Jann Gingrich signed the document on different days;

  v. deny Gingrich's request for a HAMP modification on September 3, 2014 by falsely claiming that Gingrich never returned the signed documentation;

  vi. transfer Gingrich's account to Shellpoint as if there was no modification; and

  vii. state on March 28, 2016 that all information related to the loan modification was successfully transferred to Shellpoint, and then state on May 4, 2016 that the loan modification was invalid.

129. It was unfair and deceptive for Shellpoint to claim that Gingrich *was* approved for a modification, but also state that the modification was not valid upon transfer to Shellpoint.

130. It was unfair and deceptive for Shellpoint to ignore repeated notice and proof from Gingrich related the binding loan modification.

131. It was unfair and deceptive for Shellpoint to continue to send Gingrich notices of default and intent to accelerate and foreclose.

132. It was unfair and deceptive for Defendants to induce Gingrich to make payments on the loan modification, even though Defendants never intended to implement the modification.

133. It was unfair and deceptive for Defendants to inundate Gingrich with conflicting and false information regarding the loan modification and the true status of the account, including numerous claims of a substantial default and a right to accelerate and foreclose.

134. It was unfair and deceptive for Defendants to refuse to communicate with Gingrich clearly or respond to Gingrich's disputes honestly.

135. Defendants' communications and conduct were purposely confusing, misleading, and designed to maximize profits from a scheme to collect payments, an inflated principal balance, and deferred amounts as if no loan modification existed, while collecting other payments under HAMP for obtaining "signed" loan modifications.

136. Gingrich did rely upon Defendants' actions by (a) making payments, (b) submitting and signing the same document numerous times, (c) believing that the loan modification was not approved, (d) believing that additional deferred amounts were now due at the maturity of the loan, and (e) signing the Second Modification with an additional $1,455.14 in charges added.

137. Gingrich's inquiries and disputes regarding the servicing of the loan modification were never investigated or accurately answered.

138.   Defendants'' conduct was willful, malicious, unfair, arbitrary, and designed to place Gingrich's account in a perpetual state of "default" and take advantage of vulnerable and unsophisticated consumers.

139.   Defendants' conduct offends public policy as it demonstrates an industry-wide practice of charging unearned fees and costs to a borrower to make a profit, forcing borrowers to make loan modification payments without properly crediting the payments, with the sole intention to increase the principal balance, add deferred amounts, and ultimately foreclosure, sell the real estate, and obtain a personal deficiency judgment against a borrower.

140.   Defendants' actions cause substantial injury to consumers generally because:

    i.  consumers reasonably expect their contracts to be honored, their loans and accounts to be properly managed, and their payments properly applied;

    ii.  consumers reasonably expect that creditors and loan servicers will communicate with them truthfully and accurately regarding their account and payments;

    iii.  consumers reasonably expect that loan servicers will not make false representations or induce payments on false pretenses;

    iv.  consumers reasonably expect that, if there is a dispute, the servicer will take honest efforts to resolve the dispute instead of misrepresenting facts;

    v.  consumers reasonably expect that large corporations will honor and respect federal programs and directives, including HAMP; and

    vi.  consumers reasonably expect that servicers will not to profit from their loan payments beyond the allowable interest rate and payment schedule.

145.   Additionally, consumers do not expect to be blindsided by the threat of foreclosure after being induced to make payments on false pretenses, and after relying upon false representations regarding the status of the loan account.

146.   Defendants' overall scheme was designed to thwart Gingrich's attempts to enforce the loan modification and to discourage Gingrich from continuing to fight for their home.

147.   Gingrich could not avoid these immoral undertakings because Defendants would not accurately communicate with them. Gingrich was forced into a perpetual state of confusion,

depriving Gingrich of a peaceful existence.

148.  Defendants' conduct was unethical and unending, and Gingrich had no actual control over (a) corrections to the errors in the loan modification agreement, (b) how their payments were being applied, (c) BANA's rejection of the signed loan modification agreement, (d) Shellpoint's rejection of the BANA signed loan modification agreement, (e) how Defendants truly treated the loan internally, or (f) whether Defendants' representations were truthful.

149.  All of Defendants' conduct described herein occurred in the course of conduct involving trade or commerce.

150.  This conduct is part of a pattern and practice of behavior in which Defendants routinely engage as part of their business model. It is Defendants' normal business practice to disregard existing agreements and state and federal law, then misstate the nature of outstanding "debts" and amounts "owed" by consumers for their own pecuniary gain.

151.  An award of punitive damages is appropriate because Defendants' conduct was outrageous, willful, and wanton, and showed a reckless disregard for the rights of Gingrich over a three-year period. Additionally, when Gingrich objected, Defendants ignored Gingrich, rejected a previously approved loan modification, and threatened foreclosure.

152.  Gingrich suffered damages proximately caused by Defendants' conduct of as set forth in paragraphs 107 and 109 above.

WHEREFORE, Gingrich requests that this Honorable Court:

a.  enter judgment in their favor and against BANA and Shellpoint;

b.  award Gingrich actual and punitive damages in an amount to be determined at trial for the underlying ICFA violations;

c.  award Gingrich costs and reasonable attorney's fees as provided under 815 ILCS 505/10a(c); and

d.  award any other relief as this Honorable Court deems just and appropriate.

21

### COUNT III – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT
### (AGAINST BANA AND SHELLPOINT)

159. Gingrich restates and realleges all prior paragraphs as though fully set forth herein.

160. The subject loan is a "federally related mortgage" under RESPA and 12 C.F.R. 1024.2.

161. BANA and Shellpoint each qualify as a "servicer" under RESPA § 2605(i)(2) and 12 C.F.R. 1024.2.

### A. Violation of §§ 2605(e)(1)(A), (e)(2), & (k) and 12 C.F.R. 1024.35(e)

162. RESPA § 2605(e)(2) and 12 C.F.R. 1024.35(e)(3) require a loan servicer, within 30 days of receipt of a RFI or NOE, to (i) make corrections to the account and provide the borrower a written notice; or (ii) conduct an investigation and provide the borrower a written explanation as to why the servicer believes its servicing is correct; or (iii) conduct an investigation and provide the borrower a written explanation as to why the requested information is not available.

163. Any written response must include the name and telephone number of a representative of the loan servicer who can provide assistance to the borrower.

164. Additionally, a servicer must acknowledge in writing receipt of any NOE/RFI from a borrower with five days. 12 U.S.C. § 2605(e)(1)(A); 12 C.F.R. 1024.35(d).

165. With respect to the RFIs and NOEs sent by Gingrich, Defendants (a) did not make corrections to the account, (b) did not conduct a reasonable investigation, and (c) did not respond to Gingrich in one of the three methods allowed under RESPA § 2605(e)(2) and 12 C.F.R. 1024.35(e)(3).

166. Defendants did not provide Gingrich with a name and phone number of a representative who could provide assistance to Gingrich.

167. With respect to Gingrich's September 30, 2015 NOE/RFI to Shellpoint, Shellpoint did not acknowledge receipt or respond in any fashion, in violation of RESPA § 2605(e)(1)(A); 12 C.F.R. 1024.35(d).

168. Defendants' failure to comply with RESPA is part of a pattern of practice of non-compliance with the provisions of RESPA.

169. Gingrich suffered damages proximately caused by Defendants' conduct of as set forth in paragraphs 107 and 109 above.

WHEREFORE, Gingrich requests that this Honorable Court:

    a. grant judgment in Gingrich's favor and against BANA and Shellpoint;

    b. award Gingrich actual and additional damages pursuant to RESPA § 2605(f);

    c. award Gingrich reasonable attorney's fees and costs pursuant to RESPA § 2605(f); and

    d. award any other relief this Honorable Court deems equitable and just.

### COUNT IV – VIOLATIONS OF THE FDCPA
### (AGAINST SHELLPOINT)

170. Gingrich restates and realleges all prior paragraphs as though fully set forth herein.

171. Gingrich is a consumer under § 1692a(3), as the subject loan was extended on Gingrich's primary residence and was strictly for personal, family, and household purposes.

172. The subject loan and the unauthorized fees qualify as "debts" under § 1692a(5).

173. Shellpoint is a "debt collector" under § 1692a(6) because (a) it regularly collects debts and uses the mail or telephones to collect delinquent consumer accounts, (b) the principal purpose of its business is to collect debts, (c) it regularly collect debts owed to another party, and (d) it treated the subject loan as in default when it acquired servicing rights to the loan.

### A. <u>Violation of §§ 1692e, e(2), e(5), & e(10) and §§ 1692f & f(1)</u>

174. In its attempts to collect a debt from Gingrich, Shellpoint employed false, deceptive, misleading, unfair, and unconscionable conduct by:

     i. misrepresenting the character, amount, and legal status of the subject loan in statements and acceleration notices, include a "default" amount as high as $9,870.98;

     ii. misrepresenting and assessing wrongful "default" related fees and attempting to collect those amounts – in contravention of the loan modification – when collection of those amounts was not authorized by contract or law;

     iii. threatening and asserting a right to accelerate the debt and proceed with foreclosure when no such right existed;

     iv. refusing to accurately communicate with Gingrich or respond to their inquiries.

175. Gingrich suffered damages proximately caused by Shellpoint's conduct of as set forth in paragraphs 107 and 109 above.

     WHEREFORE, Gingrich requests that this Honorable Court:

     a. enter judgment in their favor and against Shellpoint;

     b. award Gingrich statutory and actual damages in an amount determined at trial;

     c. award Gingrich costs and reasonable attorney fees under 15 U.S.C. §1692k; and

     d. award any other relief this Honorable Court deems equitable and just.

**Plaintiffs Demand Trial by Jury.**

Respectfully Submitted,

By: ___/s/ Ross M. Zambon___
        **Ross M. Zambon**
        Attorney for Plaintiffs

Ross Zambon (# 6279456)
Zambon Law Ltd.
Sulaiman Law Group, Ltd. (*of Counsel*)
Mara A. Baltabols (# 6299033)
Sulaiman Law Group, Ltd.
900 Jorie Blvd., Suite 150
Oak Brook, IL 60523
Nick Wooten
Nick Wooten LLC